Date signed April 12, 2012



THOMAS J. CATLIOTA
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MARYLAND
## at GREENBELT

| | | | |
|---|---|---|---|
| In Re: | * | | |
| | * | Case No. | 12-13189-TJC |
| Graphic Trade Bindery, Inc. | * | Chapter | 11 |
| Debtor | * | | |
| ************************************* | * | | |

## MEMORANDUM OF DECISION

NL Ventures VI Craftsman L.L.C. (the "Landlord") filed a Motion to Convert Case to Chapter 7 on March 5, 2012.  The motion was initially opposed by the Debtor Graphic Trade Bindery, Inc. ("Debtor"), who has attempted to reach a consensual resolution with all major constituents concerning the sale of its assets since (and even before) the petition date.  The Court held an initial hearing on the motion on March 23, 2012 and a final hearing on April 6, 2012, at which all parties agreed to allow a few more days of negotiation to go forward in one last effort to reach a consensus.  There, the Debtor stated that if no agreement were reached by April 12, 2012, it would not object to dismissal and the case would be dismissed.  No party objected to this process.  The Landlord and a secured creditor have filed notices with the Court that no settlement

1

has been reached, and therefore the motion is now ripe for decision. For the reasons stated herein, the Court will dismiss the case.

## Background

Debtor filed the above captioned voluntary chapter 11 case on February 23, 2012. The Debtor is a Maryland corporation that has operated as a printing company in the D.C. metropolitan area since 1983 under the trade name Craftsman Press.

### *The Debtor and its Sale Efforts*

The Debtor has experienced decreased demand for print media, together with increased pressure from large, national printing companies competing for a shrinking pool of printing jobs. The Debtor contends that these competitive pressures are shared throughout the printing industry. As a result, the Debtor has experienced cash flow problems which ultimately caused the Debtor to file its petition for relief.

Prior to the petition date, the Debtor engaged Protiviti, Inc. ("Protiviti"), a financial advisory firm specializing in restructuring and turnaround of troubled businesses. The Debtor and Protiviti analyzed the Debtor's financial position and prospects. The Debtor, with Protiviti's assistance, concluded that its creditors would realize the highest return through an orderly liquidation, preferably in chapter 11. For two months prior to filing bankruptcy, and continuing after the filing, the Debtor has been actively marketing the sale of substantially all of its assets. As of the petition date, Debtor had ceased operating in order to focus its efforts on the sale. Thus the Debtor has no source of income and its only ability to pay ongoing expenses is through the proceeds of its liquidation.

As a result of the sale efforts, the Debtor received four offers to buy certain portions of and/or broker the Debtor's property. Of these offers, the Debtor determined that the offer from

GoIndustry DoveBid, Inc. ("DoveBid"), as memorialized in the Purchase Agreement and Bill of Sale (the "APA") presented the best opportunity to maximize the value of the Debtor's property for the benefit of its creditors. The property to be sold under the APA consists of the Debtor's printing press and related equipment (the "Printing Press"). The Printing Press is the Debtor's most valuable asset, and has been described as large and immobile such that it cannot be readily sold or moved.

On March 22, 2012, the Debtor filed a motion to establish bidding and auction procedures, schedule an auction, and to approve the sale to DoveBid. Docket No. 100. The principal terms of the APA provide for a purchase price of $2.2 million. DoveBid is a reseller of printing presses and the APA provided that DoveBid would buy the Printing Press but that it would have 120 days to resell it. As such, the APA required that the Debtor must make the Premises, defined below, available for 120 days following closing to allow DoveBid to display and market the Printing Press for resale. The APA was subject to higher and better offers, with the initial overbid required to be at least $2.35 million.

At the April 6 hearing on the motion, the Debtor announced that, for various reasons, it would not be going forward with the APA. It further informed the Court and all parties that DoveBid has shifted from being a stalking horse bidder with the initial bid of $2.2 million to an auctioneer with a guaranteed minimum bid of $2.2 million. The Debtor further stated that it anticipates that the sale process can be completed by September 30, 2012. Under the new proposal, the Debtor, not DoveBid, will receive the benefit of a sale marketed by DoveBid that exceeds $2.2 million.[1] The Debtor also stated its view that, having expended considerable time

---

[1] The bidding against DoveBid on the APA might very well have been chilled by the knowledge of prospective bidders that DoveBid intended to immediately resell the Printing Press, since they could simply wait for DoveBid to

and energy into attempting to work out an agreement that would allow the sale process to go forward, it had come to the realization that a consensual resolution was not likely. It stated that, in such an event, dismissal would be the preferred resolution of the case, rather than conversion. All parties agreed, however, to make one last attempt to reach a consensual resolution. The Debtor informed the Court that if no agreement was reached by April 12, it agreed that dismissal was appropriate and asked that a dismissal order be entered upon notice that no agreement was reached. . No party disagreed to this procedure and no party offered any further evidence. Cellmark Paper, Inc. ("Cellmark") attended the hearing and voiced no objection to this resolution.

### The Debtor's Financing and Cash Collateral

The Debtor is indebted to Keltic Financial Partners II, LP ("Keltic") in the principal amount of approximately $2.4 million pursuant to the terms of a loan agreement between Keltic and the Debtor dated as of March 26, 2009. In connection with the loan agreement, Keltic was granted a senior lien on all assets of the Debtor and all proceeds and products thereof. There has been no dispute in this case that Keltic holds a senior and perfected lien in all assets of the Debtor that is superior in right to any other liens or security interests in the Debtor's property.

Cellmark, SL Financial Services, Corp., and Catterton Printing Company also hold liens, which liens are subordinate to the liens of Keltic. Cellmark filed a proof of secured claim on April 5, 2012 in the amount of $4,583,676.45. Claim 77-1. In connection with extensions of credit made by Cellmark to the Debtor, the Debtor granted Cellmark a security interest in the Debtor's inventory and accounts receivable and proceeds thereof.

---

close on the APA and then negotiate with DoveBid. Under the new proposal, DoveBid's efforts to sell the Printing Press will inure to the benefit of the Debtor.

4

The secured claims listed on the Debtor's schedule D total $14,263,592.89, the unsecured portion of which totals $11,763,048.62.  There is no dispute that the Debtor's pre-petition assets are fully encumbered.  Docket No. 53.

The Debtor filed its motion for authority to use cash collateral on March 1, 2012.  Docket No. 20.  A hearing was held on March 5, 2012 and on March 12, 2012 the Court entered an Interim Consent Order (I) Authorizing Debtor to Use Cash Collateral, (II) Authorizing Debtor to Provide Adequate Protection, (III) Scheduling Final Cash Collateral Hearing, and (IV) Granting Certain Related Relief (the "Interim Order").  Docket No. 65.  The Interim Order provided that the Debtor's ability to use cash collateral expired on March 23, 2012.  The Interim Order provides Keltic adequate protection pursuant to sections 361 and 363(e), of its interest in the collateral, including its interest in cash collateral equal in amount to the degree of diminution in value of Keltic's interest in the collateral.  Keltic was granted replacement liens pursuant to sections 361(2) and 552(a); a superpriority claim under section 507(b), and adequate protection payments as set forth in the budget attached to the Interim Order.  The same adequate protection was granted to Cellmark of its interest in its collateral, however the Interim Order provides that the Cellmark adequate protection liens shall be subordinate to the Keltic adequate protection liens.  The Debtor was granted authorization to use cash collateral to pay items in an agreed-upon budget in an amount not to exceed $555,000 in the aggregate through March 23, 2012 with a 5% variance.  The purpose of the budget is to allow the Debtor to operate until the sale of the Printing Press.  At the hearing held on March 23, the Court extended the terms of the Interim Order through April 6.  At the hearing on April 6, the Court extended the terms of the Interim Order through April 11.

### The Debtor's Lease

5

The Landlord is the lessor of the Debtor's facility located at 2300 Craftsman Circle, Cheverly, Maryland 20781 ("Premises") pursuant to a lease dated October 31, 2007 (the "Lease").  The Premises house Debtor's operations and assets, including the Printing Press.

According to the Landlord, the monthly rent due under the Lease is $107,861 for March 2012 plus escrow payments of $20,500 for a total of $128,361.  The exact amount due under the Lease each month has not been adjudicated, but these amounts seem consistent with the express provisions of the Lease.  Docket No. 61-1, Exh. C.  The Landlord contends that the Debtor was $722,236 in arrears for charges under the Lease as of the petition date.

The budget adopted pursuant to the cash collateral order approved by the Court on March 12, 2012, allows the Debtor to pay $25,000 in rent under the Lease for the five week period (February 24, 2012 – March 23, 2012).  The Landlord contends that, under the terms of the Lease, that the rent for that five week period would be $133,896 (plus escrow payments).

The Debtor has no unencumbered funds to pay the rent under the Lease.  The Debtor has been able to pay the $25,000 for the first five weeks of the case only because the secured creditors have agreed to allow their cash collateral to be used to pay that amount.

## Conclusions of Law

A movant bears the initial burden of establishing cause to convert or dismiss a case pursuant to section 1112(b).[2]  11 U.S.C. § 1112(b)(1); *In re Sydnor*, 431 B.R. 584, 590 (Bankr. D. Md. 2010).  Section 1112(b)(4) contains a non-exclusive list of circumstances that constitute

---

[2] Section 1112(b)(1) of the Code provides:
> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1)

cause.  11 U.S.C. § 1112(b)(4).  Once a *prima facie* showing of cause is made, the court shall dismiss or convert the case to Chapter 7, whichever is in the best interests of the estate and creditors, or appoint a trustee, unless the provisions of subsections (b)(2)[3] or (c)[4] apply.  The burden shifts to the debtor to establish the applicability of section 1112(b)(2).

Here, the Court need not dwell for long on the standards for establishing "cause" for dismissal or conversion under section 1112(b).  All parties now agree that cause exists to dismiss this case or convert it to chapter 7.  The Court independently concludes that "cause" exists to dismiss or convert, for reasons that will become apparent in discussing whether conversion or dismissal is in the best interest of the creditors and the estate.

Indeed, no party, other than the Debtor, has argued that cause does not exist to dismiss or convert.  However, Cellmark has now raised a procedural objection.  In the motion, Landlord sought conversion of the case.  At the initial hearing on March 23, 2012, however, counsel for Landlord stated that its actual preference was for dismissal, and counsel for Keltic stated it might very well support dismissal depending on the result of ongoing negotiations.  Thus dismissal, rather than conversion, was discussed at the initial hearing on the motion.  Landlord filed a brief

---

[3] Section 1112(b)(2) provides:
>  (2) The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that—
>>  (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and
>>  (B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)—
>>>  (i) for which there exists a reasonable justification for the act or omission; and
>>>  (ii) that will be cured within a reasonable period of time fixed by the court.
>  11 U.S.C. § 1112(b)(2).

[4] Section 1112(c) provides:
>  The court may not convert a case under this chapter to a case under chapter 7 of this title if the debtor is a farmer or a corporation that is not a moneyed, business, or commercial corporation, unless the debtor requests such conversion.
>  11 U.S.C. § 1112(c).

on April 5 asking for dismissal rather than conversion.  Docket No. 143.  And as stated above, at the April 6 hearing, the Debtor announced that if the parties were unable to reach an agreement by April 12, the case would be dismissed.  No party, including Cellmark, objected to that disposition.

On April 9, the Debtor circulated and uploaded a proposed final cash collateral order that, consistent with its statements at the April 6 hearing, stated:

> In the event the Debtor is unable to reach an agreement with [Landlord] and those secured creditors who have an interest in the Cash Collateral regarding the Debtor's continued use of Cash Collateral beyond the Interim Period, this chapter 11 case shall be dismissed for the reasons set forth on the record at the Hearing (unless the aforementioned parties agree otherwise), and Debtor's counsel shall upload an order consistent therewith.[5]

Cellmark filed a Limited Objection that day and an Amended Limited Objection on April 10, 2012 stating that the above paragraph would allow the Debtor to achieve dismissal of the case only because the consensus of a majority of the creditors' favored it, a reason that the Fourth Circuit found was not an appropriate cause for dismissal.  *Rollex Corp. v. Associated Materials, Inc. (In re Superior Siding & Window, Inc.)*, 14 F.3d 240, 241 (4th Cir. 1994). Cellmark also objected to that proposed paragraph on the grounds that pursuant to Federal Bankruptcy Rule 1017(a), notice of proposed dismissal must be provided to all creditors prior to dismissal of a case.[6]  Thus Cellmark objects to dismissal of the case, as opposed to conversion, because a

---

[5] The third interim cash collateral order as entered by the Court provides, at paragraph 2, that:

> In the event the Debtor is unable to reach an agreement, with NL Ventures IV Craftsman, L.L.C. and those secured creditors who have an interest in the Cash Collateral regarding the Debtor's continued use of Cash Collateral, the Debtor shall file a praecipe with the Court stating same and shall state its preference for conversion or dismissal. The Court thereafter will resolve the pending motion to convert the case filed by NL Ventures.

Docket No. 162, p. 3.

[6] Cellmark argues that notice of the proposed dismissal of this case has not been provided to parties in accordance with Bankruptcy Rule 1017(a).  Rule 1017(a) provides that a case "shall not be dismissed on motion of the

separate notice was not issued for dismissal, as opposed to the notice given on the motion to convert. This Court disagrees with Cellmark on this procedural point for several reasons.

Cellmark's position is not consistent with the Fourth Circuit's decision in *Superior Siding,* the seminal case on section 1112(b*).* There, seven previously unsecured creditors gained a prepetition advantage over other unsecured creditors by obtaining prepetition judgments. *Superior Siding,* 14 F.3d at 241. As a result of their judgments, if the case were dismissed the judgment liens gave them priority against the assets of the debtor over general unsecured creditors. *Id.* The judgment lien creditors sought dismissal. A large unsecured creditor sought conversion rather than dismissal, arguing that in chapter 7 the judgment liens would be avoided as preferences and all creditors would be an equal unsecured footing. *Id.* at 241-42. The bankruptcy court granted dismissal because the majority of the unsecured creditors requested dismissal. *Id.* at 241.

In reversing the bankruptcy court, the Fourth Circuit first identified the process the bankruptcy court must undertake to resolve a motion under section 1112(b):

> A motion filed under [§1112(b)] invokes a two-step analysis, first to determine whether "cause" exists either to dismiss or to convert the Chapter 11 proceeding to a Chapter 7 proceeding, and second to determine which option is in "the best interest of creditors and the estate." Once "cause" is established, a court is required to consider this second question of whether to dismiss or convert.

---

petitioner, for want of prosecution or other cause, or by consent of the parties, before a hearing on notice as provided in Rule 2002." Fed. R. Bankr. P. 1017(a). Rule 2002(a) in turn provides, as pertinent here, that "[e]xcept as provided in subdivisions (h), (i), (*l*), (p), and (q) of this rule, the clerk, or some other person as the court may direct, shall give the debtor, the trustee, all creditors and indenture trustees at least 21 days' notice by mail of...(4) in a ... chapter 11 reorganization case... the hearing on the dismissal of the case or the conversion of the case to another chapter, unless the hearing is under §707(a)(3) or §707(b) or is on dismissal of the case for failure to pay the filing fee..." Fed. R. Bankr. P. 2002(a)(4). On March 7, 2012, after the Landlord filed the motion to convert, the Court issued an Order and Notice of a Hearing on Motion to Convert to Chapter 7. Docket No. 46. That Order provided notice pursuant to Rule 2002(a) that a hearing on the Landlord's motion to convert would be held March 23, 2012 at 1:30 p.m.

*Id.* at 242 (citations omitted).  Once cause is established, the task of the bankruptcy judge is to ascertain the impact to the creditors and the estate of conversion or dismissal.  *Id.* at 243.  That analysis requires a comparison of the results to creditors in bankruptcy with the results to creditors under state law outside of bankruptcy.  *Id.*

Two important principles, pertinent here, are established by *Superior Siding.*  The first is that, whether a motion seeks dismissal or conversion, once the court determines that cause exists under section 1112(b), it is up to the court to determine whether conversion or dismissal is in the best interests of the creditors and the estate.  The second principle is that this determination is not made by majority vote, or for that matter, by the dictates of any one creditor or group of creditors.  As the Fourth Circuit stated, one of the factors to be considered is the policy of equality among creditors and that policy is not served by merely tallying the votes of the creditors.  *Superior Siding,* 14 F.3d at 242.  The court must independently determine which option is in the best interest of creditors and the estate.   Accordingly, the mere fact that a section 1112(b) motion seeks only conversion is no bar to dismissal if the court determines that dismissal is in the best interest of the creditors and the estate.  The opposite is also true.  The task of the bankruptcy court is to determine which option is the better choice.

*Superior Siding* is consistent with the express language of section 1112(b).  As pertinent here, it provides that upon a showing of cause, "the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate."  11 U.S.C. § 1112(b).  There is nothing in the statute that supports the view that, in connection with a section 1112(b) motion that seeks only either conversion or dismissal, the court must grant the express relief sought in the section 1112(b) motion, even if

10

the court determines that the requested relief is not the better option for the creditors or the estate. The statutory language is expressly to the contrary.

Cellmark's approach -- that where a motion is filed that asks for only one form of relief, once the court finds that cause exists under section 1112(b), the court must take the action requested by the movant -- leads to a result that is contrary to the express holding of *Superior Siding*. Under Cellmark's approach, the court would be required to adopt the relief requested by the creditor who filed the motion *(i.e.* the majority view) even if the court determines that the alternative form of relief is in the best interests of creditors or the estate.

Moreover, Cellmark's contention would often make it impossible for the court to comply with section 1112(c) in cases where the section 1112(b) motion seeks only conversion or dismissal, not both, but the court concludes the requested relief is not the better option. Section 1112(c) requires that the court hold the hearing on section 1112(b) motion within 30 days after filing of the motion, and must decide the motion not later than 15 days, unless the movant agrees otherwise. In this case, the Court held the initial hearing on the motion on March 23 and the final hearing on April 6. Thus the statute required the Court to resolve the motion on April 7, although Landlord agreed to extend the period in an attempt to reach a settlement, but only until April 12. The statute requires that the Court now resolve the motion. Cellmark apparently seeks further notice and opportunity for a hearing. But the statute is clear; the matter must be resolved.

The Court concludes that, in light of the express language of section 1112(b) and the longstanding holding of *Superior Siding,* all parties were on notice that if the court determined that "cause" was established to dismiss or convert, the court would determine which option is in the best interests of creditors and the estate, notwithstanding the relief requested in the motion. The Court therefore concludes that notice of the hearing on the potential dismissal was proper

11

under Bankruptcy Rule 2002(a) and 1017(a). The Court will now turn to the issue of which option is in the best interest of creditors and the estate in this case.[7]

The fundamental problem facing the Debtor in this bankruptcy case was plainly stated by the Debtor at the first cash collateral hearing on March 5, and has been the focus of every hearing since. The Debtor's primary and most valuable asset – the Printing Press – is large and immobile. It must be sold from its present location at the Premises to maximize its value. For the Debtor to realize the maximum value from its sale, the Debtor needs the use of the Premises for approximately seven months. But the Debtor has ceased operations, and all of it pre-petition assets are encumbered. The Debtor generates an administrative rent claim each month of approximately $130,000 that it cannot pay. Between the petition date and September 30 (the outside date for completing a sale), approximately $910,000 will be due under the Lease. Yet the Debtor has been authorized to pay only $25,000 of funds under the Interim Order to pay the rent, and the secured creditors have not agreed to allow any other funds to be used to pay rent. The Debtor has no ability to pay the $130,000 approximate monthly rent under the Lease. Nor has any party established that upon completion of its liquidation, the Debtor will have the resources to pay the post-petition rent and other expenses of administration.[8]

---

[7] In turning to this question, the Court notes that Cellmark has not contended one way or the other whether dismissal or conversion is in the best interests of the estate. It has raised the procedural point and been silent as to which option is the better choice.

[8] Pursuant to section 365(d)(3) a Debtor must timely perform all of its obligations under a nonresidential lease of real property following entry of the order for relief. 11 U.S.C. § 365(d)(3). This requirement is notwithstanding section 503(b)(1). The Debtor does not dispute that Landlord is entitled to an administrative claim for post-petition rent and other charges that have accrued. The Fourth Circuit held, in a related context, that "the decision whether to order immediate payment of administrative expenses allowed pursuant to [§ 365(d)(3)] and § 503(b) is left to the discretion of the bankruptcy court." *CIT Comm. Fin. Corp. v. Midway Airlines Corp. (In re Midway Airlines Corp.),* 406 F. 3d 229, 242 (4th Cir. 2005). But that discretion does not include allowing a debtor to generate substantial administrative rent claims with only the mere hope of ultimately being able to pay them.

Under these circumstances, dismissal is the better option.  In the first six weeks of this case, the Debtor has already incurred substantial administrative claims that it cannot pay, most notably rent due under the Lease.  Conversion to chapter 7 will result in additional administrative claims for which there are no apparent resources to satisfy.  Further, all of the Debtor's assets are fully encumbered, and no party disputes that the claims of the secured creditors greatly exceed the value of the assets.  The secured creditors can fend for themselves under their contractual and nonbankruptcy rights.

Finally, although no party addressed it, the Court has reviewed the Debtor's Statement of Financial Affairs.  The Statement lists some $1.4 million of payment to creditors during the preference periods, which therefore constitute potential preference claims.  A chapter 7 trustee's ability to pursue potential preferences would ordinarily weigh in favor of conversion, since the potential recoveries could augment the estate to the benefit of the unsecured creditors.  Here, however, the Court concludes that the potential for preference recoveries does not override the certainty of the unpaid rent and other administrative claims.

### Conclusion

For the foregoing reasons, the Court will dismiss the case.

cc:     All Parties

        All Counsel

### End of Memorandum

13